Salvatore **BRUNETTI**, Plaintiff,

v.

**FEDERAL BUREAU OF INVESTIGATION,**
Defendant.

No. 01–1351 (RJL).

United States District Court, District of Columbia.

July 14, 2004.

Salvatore Brunetti, Allenwood United States Penitentiary High Security, White Deer, PA, pro se.

Stratton C. Strand, U.S. Attorney's Office, Washington, DC, for Defendant.

### MEMORANDUM OPINION AND ORDER

LEON, District Judge.

Before the Court are the parties cross-motions for summary judgment. This action concerns a request made by the plaintiff, Salvatore Brunetti ("Brunetti"), who is proceeding *pro se*, under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a, for certain documents regarding himself in the possession of the Federal Bureau of Investigation ("FBI"). For the following reasons, the Court GRANTS the defendant's motion for summary judgment and DENIES the plaintiff's motion for summary judgment.

### Background

Brunetti is currently serving a forty-year prison term for his conviction for Racketeer Influenced and Corrupt Organizations ("RICO") violations in connection with his activities in the Philadelphia branch of the La Cosa Nostra organization. Declaration of Carol L. Keeley ("Keeley Decl.") ¶¶ 5–7. On August 14, 1997, following his conviction and sentencing, Brunetti submitted a FOIA request to the FBI for "all records in [the] possession of the [FBI] on myself or which makes reference to myself." First Declaration of Christine Kiefer ("First Kiefer Decl.") ¶ 4

and Ex. A. On September 4, 1997, the FBI acknowledged the receipt of Brunetti's request and advised plaintiff that the request was not yet assigned because the Request Management Unit ("RMU") was unable to process Brunetti's request in a timely manner due to critical understaffing. Def. Stmt. of Undisputed Facts ¶ 2. In March 1999, FBI contacted Brunetti to inquire whether he was still interested in receiving the requested material in light of the period of time that had elapsed. *Id.* ¶ 3. Brunetti indicated that he was interested in receiving the material notwithstanding the delay. *Id.* ¶ 4.

The FBI located responsive records by performing searches of the Central Records Systems ("CRS")[1] indices. One file was identified, 281–PH–63314, which related to the FBI's RICO investigation of the Philadelphia branch of La Cosa Nostra, targeting Brunetti and other subjects. First Kiefer Decl. ¶ 27. The file contained approximately 33,000 pages and was maintained in the FBI's Philadelphia Field Office. *Id.* The Philadelphia Field Office reviewed the file and identified approximately 2,100 pages that were responsive to Brunetti's request. *Id.* Those documents were then reviewed by the FBI FOIA unit to identify information that would be exempt from disclosure.

In January, 2002, the FBI advised Brunetti that it had located 2,100 pages relevant to his request. Def. Stmt. of Undisputed Facts ¶ 5. In July, 2002, the FBI made an interim production to Brunetti consisting of 484 pages which had been reviewed. *Id.* ¶ 7. In August of 2002, Brunetti paid for the interim production and limited the scope of his request to exclude public court transcripts. *Id.* ¶ 8. In October, 2002, the FBI made an additional production of 330 pages of responsive documents and advised Brunetti that it had withheld information pursuant to various FOIA exemptions, discussed more in detail below. *Id.* ¶ 9. In July, 2003, the FBI released an additional 38 pages to Brunetti that it reconsidered during its preparation of the *Vaughn* index for this case. *Id.* ¶ 11. The remaining documents were withheld in their entirety, as described in the FBI's *Vaughn* index. Keeley Decl. 27–31.

In the course of processing Brunetti's FOIA request, the FBI identified four records that had originated in the Criminal Division of the Department of Justice and, according to FBI's FIOA procedures, referred those documents to the Criminal Division for review. Declaration of Joseph S. Beck ("Beck Decl.") ¶ 4,6; First Kiefer Decl. ¶ 18, 19. On October 23, 2002, the Criminal Division initially informed Brunetti that it was withholding all four documents in their entirety. Def. Stmt. of Undisputed Facts ¶ 14, 15. Upon further review, the Criminal Division released one of the withheld documents in its entirety and part of another document, but continued to withhold the remaining two documents. Id. ¶ 16.

[1]. The CRS consists of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. First Kiefer Decl.¶ 22. The records themselves may be maintained at FBI headquarters or at field offices. The CRS has General Indices that are arranged in alphabetical order and index information contained in the files, such as names of individuals and organizations. *Id.* ¶ 23. The General Indices are the means by which FBI's FOIA unit retrieves records relevant to a particular request. *Id.* The indices indicate whether the search term is the main subject of a record, or is merely referenced in the record. *Id.* In addition, there are a number of automated applications that support case management functions at the FBI and are searchable for purposes of FOIA requests. *Id.* ¶ 25. The FBI does not index every name in a particular file; only names that are considered pertinent, relevant, or essential to future retrieval are indexed. *Id.* ¶ 26.

Brunetti brought this lawsuit in June of 2001, more than two years after he informed the FBI that he was still interested in receiving documents responsive to his request, but before he received any documents from the FBI. Brunetti filed a Motion for Summary Judgment in September of 2002 requesting that the Court order the FBI to release all relevant records. In February of 2003, following multiple extensions of time, the FBI filed an opposition to Brunetti's motion, arguing that, *inter alia*, that it had completed its production, rendering Brunetti's motion groundless. The FBI also filed a Motion for Summary Judgment on the grounds that it has conducted an adequate and thorough search for responsive documents, has released all responsive documents that it has identified, except for those records withheld under a valid claim of exemption, and has provided a thorough *Vaughn* index describing the documents withheld in part or in whole. Brunetti filed a motion entitled "Motion in Response to Defendant's Vaughn Index," which seeks "clarification" of the exemptions claimed and challenges the legality of certain redactions and withholdings. It does not raise any specific objection to the application of the various exemptions relied upon by the FBI. In addition, Brunetti objects to the FBI's referral of certain documents to the Criminal Division and to the exemptions applied by the Criminal Division to those documents. The Court will treat this motion as an opposition to the FBI's motion for summary judgment.

### Discussion

#### I. Standard of Review

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment may support its mo-

tion by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *See Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). In opposing summary judgment, the "nonmoving party [must] go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c), (e)). The court must view the facts in the light most favorable to the non-movant, giving the non-movant the benefit of all justifiable inferences derived from the evidence in the record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ In a FOIA case, summary judgment can be grated for an agency based only on agency affidavits "if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir.1981). It is the FBI's burden to establish that any exemption from disclosure applies. 5 U.S.C. § 552(a)(4)(B). However, the Court is to accord "substantial weight" to an agency's affidavit concerning the details of the classified status of a disputed record. *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir.1981). However, the Court is mindful, as well, that the pleadings of *pro se* litigants are held to "less stringent standards" than those filed by litigants with

counsel. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *see also Richardson v. United States,* 193 F.3d 545, 548 (D.C.Cir.1999).

## II. Adequacy of the FBI's Search

█ Before addressing the applicability of FOIA exemptions, the Court must first assess whether the agency's search for responsive documents was adequate. While there is no requirement that an agency search every record system in response to a FOIA request, *Meeropol v. Meese,* 790 F.2d 942, 952–53 (D.C.Cir. 1986), an agency must search records systems in which it is likely to find responsive records. *Oglesby v. U.S. Department of the Army,* 920 F.2d 57, 68 (D.C.Cir.1990). The government is entitled to summary judgment on the adequacy of its search if it can show that it made a good faith effort to conduct the search, using methods that could reasonably be expected to produce the information requested. *Id.* (citing *Weisberg v. U.S. Department of Justice,* 745 F.2d 1476, 1485 (D.C.Cir.1984)).

█ The FBI puts forth the declaration of Christine Kiefer, an attorney of the FBI and the Acting Chief of the Litigation Unit, Freedom of Information and Privacy Acts Section, Record Management Division at the FBI headquarters to establish the adequacy of its search.[2] Kiefer describes in great detail the structure of the FOIA unit of the FBI and the various processes involved in implementing a search. See First Kiefer Decl. 4–11. In the case of Brunetti's request, the agency searched the CRS indices. Keeley Decl. ¶ 6; First Kiefer Decl. ¶ 27. These indices contain information from documents maintained at FBI headquarters and at any of the field offices and they are the means by which FBI's FOIA unit retrieves records relevant to a particular request. First

Kiefer Decl. ¶ 23, 24. The FBI does not index every name in a particular file; only names that are considered pertinent, relevant, or essential to future retrieval. *Id.* ¶ 26. In addition, there are a number of automated applications that support case management functions at the FBI and are searchable for purposes of FOIA requests. *Id.* ¶ 25.

The only file regarding or referring to Brunetti that was listed in the indices was the FBI's file regarding the RICO investigation into Brunetti and other targets. First Kiefer Decl. ¶ 27. This file was then reviewed by the Philadelphia Field Office for documents relevant to Brunetti's request (i.e. documents about Brunetti or referencing Brunetti) producing approximately 2,100 pages. *Id.* Brunetti does not make any specific objections to the adequacy of the FBI's search and he does not argue that there were other methods or sources available would have yielded additional documents responsive to his search. In addition, the fact that the FBI's search included its field offices, and did in fact produce a file from a field office further evinces the adequacy of the FBI's search in this case. The Court finds that, under these circumstances, the FBI's search was adequate based on the description of documents provided by Brunetti.

## III. FOIA Exemptions Invoked by the FBI

The FBI has moved for summary judgment on the grounds that it withheld records that are appropriately exempted from disclosure under FOIA and that it has adequately justified the exemptions claimed in the declarations provided by Carol L. Keeley, Assistant Section Chief of the Record/Information Dissemination Section, Record Management Division, at

---

**2.** The Criminal Division did not conduct a separate search, it merely reviewed a set of documents that originated with that division. Def. Mot. for Summ. J. at 11.

FBI headquarters, and the Declaration of Joseph S. Beck, of the Criminal Division, Office of Enforcement Operations. These declarations constitute the defendant's *Vaughn* indexes explaining the information redacted and/or withheld by the FBI (Keeley) and by the Criminal Division (Beck).[3]

The FBI invokes the following six FOIA exemptions in its index: (1) 5 U.S.C. § 552(b)(2) ("exemption (b)(2)"); (2) 5 U.S.C. § 552(b)(3) ("exemption (b)(3)"); (3) 5 U.S.C. § 552(b)(7)(C) ("exemption (b)(7)(C)"); (4) 5 U.S.C. § 552(b)(7)(D) ("exemption (b)(7)(D)"); (5) 5 U.S.C. § 552(b)(7)(E) ("exemption (b)(7)(E)"); and (6) 5 U.S.C. § 552(b)(7)(F) ("exemption (b)(7)(F)"). Brunetti objects to specific withholdings and redactions based on exemptions (b)(7)(C), (b)(7)(D), and (b)(7)(E).

### A. Exemption (b)(2)

■ Exemption (b)(2) exempts from disclosure any information "related solely to the internal personnel rules and practices of an agency." This Circuit has held that an agency may withhold material under exemption (b)(2) if it is able to demonstrate that (1) the material is "'predominantly internal[']'" and (2) "'disclosure [would] significantly risk[ ] circumvention of agency regulations or statutes.'" *National Treasury Employees Union v. U.S. Customs Service*, 802 F.2d 525, 528 (D.C.Cir.1986) (quoting *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1073–74 (D.C.Cir.1981)). The FBI invokes this exemption, along with exemption (b)(7)(D), to protect permanent source

symbol numbers and informant file numbers that are created by the FBI for internal use. Permanent source symbol numbers[4] are used in lieu of an informant's name in all documents produced by the FBI in an effort to protect that person's identity. Keeley Decl. ¶ 15. Informant file numbers are codes used to signify the nature of the information provided by a source. *Id.* ¶ 19. This code is coupled with the source symbol number to catalog information gathered from sources while protecting their identity. *Id.* Because these unique identifiers are used consistently across FBI records, it would be possible, with access to the numbers, to discern patterns of information associated with particular sources. An individual with knowledge of the people and facts would be able to deduce the identities of these sources, putting the sources at risk of exposure and potentially placing them in danger. Accordingly, the Court concludes that the release of the numbers would risk revealing the identities of informants in circumvention of FBI policies and practices related to information gathering and protecting confidential informants.

■ In addition, the exemption can be applied to internal matters that are "truly internal, and not of legitimate public interest." *Crooker*, 670 F.2d at 1056. The FBI invokes exemption (b)(2) in this manner to protect the radio frequency numbers used by the FBI to communicate internally and with other law enforcement agencies. Keeley Decl. ¶ 20. This information clearly constitutes and internal practice and

---

**3.** The D.C. Circuit held in *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973), that there is no set form for an index compiled in response to a FOIA request. However, three important elements are (1) that the index is one document, (2) the index must adequately describe the withheld documents or deletions, and (3) the index must state the particular FOIA exemption and explain why the exemption ap-

plies. *Founding Church of Scientology of Washington, D.C., Inc. v. Bell*, 603 F.2d 945, 949 (D.C.Cir.1979).

**4.** Source symbols numbers are comprised of an alphanumeric code indicting the field office where the informant has operated and a unique sequentially assigned code for that individual. Keeley Decl. ¶ 15.

there is no indication that there is a genuine public interest in the FBI's radio frequency usage. Therefore, redaction of the permanent source symbol numbers, informant file numbers, and FBI radio frequencies were properly withheld under this exemption.

### B. Exemption (b)(3)

■ Exemption (b)(3) exempts from disclosure any matters that are "specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). The FBI has withheld a number of documents under this exemption in conjunction with Rule 6(e) of the Federal Rules of Criminal Procedure, which governs the secrecy of grand jury proceeding. This Circuit has held that information which would reveal matters that occurred before a grand jury is exempt from disclosure under exemption (b)(3). *Fund for Constitutional Gov't v. Nat'l Archives and Records Serv.*, 656 F.2d 856, 868 (D.C.Cir. 1981). In this case, the FBI withheld grand jury subpoenas, as well as the names and other identifying information of the individuals named in the subpoenas, records subpoenaed by the grand jury, and the dates of grand jury meetings. Keeley Decl. ¶ 22. Release of this information would reveal the substance of the grand jury's investigation as well identify specific evidence considered by the grand jury. Therefore, this information was properly withheld by pursuant to exemption (b)(3).

### C. Exemption (b)(7)(C)

■ Exemption (b)(7)(C) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information... could reasonably be expected to constitute an unwarranted invasion of personal privacy." In asserting this exemption, the FBI is required to balance the nature of the privacy interest with the public interest in disclosure. *Albuquerque Publ'g Co. v. Dept. of Justice*, 726 F.Supp. 851, 855 (D.D.C.1989). This Circuit has held that stated that " '[e]xemption 7(C) takes particular note of the strong interest of individuals, whether they be suspects, witnesses, or investigators, in not being associated unwarrantedly with alleged criminal activity.' " *Computer Professionals for Social Responsibility v. U.S. Secret Service*, 72 F.3d 897, 904 (D.C.Cir.1996) (quoting *Dunkelberger v. Department of Justice*, 906 F.2d 779, 781 (D.C.Cir.1990)). This exemption has been used to protect the identities of witnesses or third parties mentioned in law enforcement records in such a way as to implicate them or associate them with criminal activity, the identities of law enforcement officers involved in a criminal investigation, and individuals who provide information to law enforcement authorities and courts have held that these groups have an interest in anonymity that is properly protected under these circumstances. *Davis v. U.S. Department of Justice*, 968 F.2d 1276, 1281 (D.C.Cir. 1992); *Computer Professionals for Social Responsibility v. U.S. Secret Service*, 72 F.3d 897, 904–05 (D.C.Cir.1996).

The FBI exempted eight categories of information under this exemption. First, the FBI withheld names and other identifying information of FBI Special Agents who were involved in "conducting, supervising, and/or maintaining the investigative activities reported in the files concerning [Brunetti]." Keeley Decl. ¶ 25. The names and other identifying information of other FBI support staff were withheld under this exemption as well. *Id.* ¶ 26. The FBI argues that the release of this person-

al information does not promote a legitimate public interest under FOIA, and would "likely lead to embarrassment or public notoriety for the individuals involved." Def. Mot. for Summ. J. at 31. Under similar reasoning, the FBI withheld names and/or identifying information of the following categories of individuals: state and local law enforcement employees, specifically the Philadelphia Police Department and the Pennsylvania State Police, who worked with the FBI during the course of the investigation of Brunetti and the other targets, Keeley Decl. ¶ 27; and state and local government employees, specifically employees of the Pennsylvania Attorney General's Office, the Camden County prosecutor's Office and the Gloucester County Prosecutor's Office, Keeley Decl. ¶ 29. In addition, the FBI withheld the name of a United States Marshall Service employee, the name of a United States Probation Officer, Keeley Decl. ¶ 34, and the name of an employee of a financial institution who co-operated with the FBI during the course of the RICO investigation by providing information such as a credit bureau search associated with Brunetti, Keeley Decl. ¶ 35. The FBI notes that all of these individuals were acting in their official capacity, and that in addition to the privacy interest at stake, which are similar to those of the Special Agents, disclosure of their names would have a chilling effect on such cooperation in future investigations. The privacy interests at stake for these individuals are sufficiently compelling, and the public interest sufficiently tenuous, especially in light of the potential detrimental effect on the FBI's ability to obtain cooperation in conducting investigations, that the balance weighs in favor of withholding the specified information.

The FBI also withheld names and identifying information [5] of the following categories of individuals: "third parties who were of investigative interest to the FBI or other law enforcement agencies during the course of investigating the activities of [Brunetti] and other individuals," Keeley Decl. ¶ 28; "third parties who were merely mentioned" in Brunetti's file, but were not of investigative interest, Keeley Decl. ¶ 30; third parties who were interviewed by law enforcement during the course of the RICO investigation,[6] Keeley Decl. ¶ 31. Disclosure that these individuals were connected to La Cosa Nostra and a RICO investigation could be very detrimental to their reputations, and could possibly subject them to undue attention or put them in danger. On the other hand, the public interest in disclosing the identities of these individuals is minimal, and, in this Court's judgment, does not outweigh the privacy interest of the individuals. Thus the disclosure of this information would constitute an unwarranted invasion of privacy of the individuals in questions and is properly withheld under exemption (b)(7)(C).

Brunetti objects, without making specific arguments, to redactions pursuant to this exemption on eleven pages of the FBI's production. Pl. Mot. in Resp. to Vaughn Index ("Pl.Opp.") at 2. For example, page 410 of the FBI's production is a memorandum on FBI letterhead, dated January 23, 1996, regarding the recovery of a small device found in a garage in Philadelphia. Keeley Decl. Ex. B at 410. The device,

5. The types of information, other than names, that were withheld includes driver's license numbers, social security numbers, FBI numbers, INS numbers, arrest records, vehicle tag numbers, home addresses, dates of birth, and places of birth. Keeley Decl. ¶ 28.

6. The FBI withheld 440 pages of third party interviews under this exemption and exemption (b)(7)(D) because the interviews were conducted under circumstances which give rise to a reasonable inference of confidentiality, discussed more fully below. Keeley Decl. n. 8.

according to the memorandum, was "used in conjunction with a pipe bomb used in several unsuccessful murder attempts" by associates of La Cosa Nostra. *Id.* The names of the special agents are redacted, as are the address of the garage and the identity of the owner of the garage. Absent specific objections by Brunetti creating a genuine issue of material fact as to the exemption of this type of information, the FBI has met its burden of establishing the basis for withholding documents under exemption (b)(7)(C).

### D. Exemption (b)(7)(D)

■ Exemption (b)(7)(D) provides for the withholding of:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source....

This exemption provides for protection of all information provided by a confidential source if there has been an explicit assurance of confidentiality or circumstances existed which would have implied an understanding of confidentiality. *U.S. Department of Justice v. Landano*, 508 U.S. 165, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993).

The FBI relied upon this exemption in withholding two categories of information, both of which rely upon other exemptions as well. First, the FBI relies on this exemption in its withholding of source symbol numbers and informant file numbers, discussed above in relation to exemption (b)(2). These sources provided information to the FBI under an express guarantee of confidentiality. Keeley Decl. ¶ 38–40. The Court finds that the FBI's internal numbering system for confidential informants is appropriately withheld under these circumstances, especially when the release of the numbers might lead to the discovery of the confidential informant's identity.

■ The second category of information withheld under this exemption consists of witness interviews that were conducted under circumstances where assurances of confidentiality are implied. Keeley Decl. ¶ 43. The interviewees in question include witnesses to violent crimes, criminal associates of Brunetti who cooperated with the investigation, and targets and victims of La Cosa Nostra's activities and crimes. *Id.* The FBI argues that, were these interviewees' identities revealed, they might be placed in grave danger in light of the violent nature of La Cosa Nostra.[7] As a result, the FBI argues, it can be inferred that the interviewee had assurances of confidentiality such that the details of their interviews may now be appropriately withheld under exemption (b)(7)(D) where disclosure of such information may constitute a disclosure of the interviewee's identity.

The FBI states that it attempted to redact the documents related to these in-

---

7. "It can be inferred from the very nature of plaintiff and his associates gang-related activities which include murder, kidnaping, obstruction of justice, arson, extortion and other violent crimes, that each of the interviewees were interviewed under circumstances from which confidentiality can be implied. Given the violent nature of the violent crimes committed by La Cosa Nostra, disclosure of the identities of the third party interviewees could result in possible physical harm/mental harm, and possibly death." Keeley Decl. ¶ 43.

terviews, but in some instances, entire pages had to be withheld because they could not reasonably be redacted to release information without revealing the identity of the interviewee. The FBI provided a chart cataloging the exact pages withheld, the type of document withheld, and the reason for the withholding. Keeley Decl. 27–31. The vast majority of the pages withheld in their entirety are pages of FD–302 interview forms in which the interview is recorded in a narrative form or interview notes recorded by a Special Agent. The Court finds that assurances of confidentiality can be inferred in this situation, where interviewees might be endangered as a result of their cooperation with the FBI and that the withholdings of interviews and interview notes are proper under exemption (b)(7)(D).

Brunetti objects to the use of exemption (b)(7)(D) with respect to redactions on ten pages of the FBI's production, but again fails to make any specific argument as to why the exemption would not apply. Pl. Opp. at 2. As an example, page 431 of the FBI's production is an FD–302 reflecting a telephone interview with a cooperating witness regarding Brunetti. Keeley Decl. Ex. B at 431. The identity of the witness, his place of business, and the information he provided were redacted from the document pursuant to exemption (b)(7)(D).[8] In the absence of an argument by Brunetti raising a genuine issue of material fact as to the applicability of this exemption to this type of information, the FBI has met its burden of establishing the basis for withholding documents under exemption (b)(7)(D).

### E. Exemption (b)(7)(E)

 Exemption (b)(7)(E) provides for the withholding of:

> records or information compiled for law enforcement purposes, but only to the

extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law . . .

The FBI invokes this exemption to withhold information from Form FD–515, a form used by Special Agents to report investigative accomplishments during various stages of an investigation. Keeley Decl. ¶ 45. In the upper right hand side of this form is a block captioned "Investigative Assistance or Technique Used" and a space for the agent to indicate which techniques were most useful to the investigation. See e.g. Keeley Decl. Ex. B at 237. The FBI released these forms, but redacted the area where the agent ranked the investigative techniques. The FBI argues that release of the police officers notations as to which techniques were used and as to their efficacy would allow criminals to adapt their activities and methods in order to avoid future detection. Keeley Decl. ¶ 45. Although Brunetti objects to the redaction of this type of information on two of the pages (i.e. pages 237 and 239), he offers no specific argument as to why the exemption is improper under the circumstances. Pl. Opp. at 2. Under these circumstances, and considering the limited nature of the redactions, the Court finds that withholding this data under exemption (b)(7)(E) was appropriate.

### F. Exemption (b)(7)(F)

 Exemption (b)(7)(F) provides for the withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or infor-

---

8. This exemption was used in conjunction with exemption (b)(7)(C), discussed above.

mation ... could reasonably be expected to endanger the life or physical safety of any individual." The FBI invokes this exemption in conjunction with exemptions (b)(7)(C) [9] and (b)(7)(D) to protect the names, identifying information and information provided by third parties during the course of the FBI investigation of Brunetti and the other targets of the investigation. Keeley Decl. ¶ 47. The FBI argues that, given the violent nature of the La Cosa Nostra organization, these individuals could be endangered as a result of their co-operation with the FBI against Brunetti and the organization if their identities were to be made known. The Court agrees and finds that the withholdings under this exemption are appropriate in this case.

## IV. FOIA Exemptions Invoked by the Criminal Division

The FBI also identified four records, consisting of 25 pages, which originated with the Office of Enforcement Operations, Criminal Division. Keeley Decl. ¶ 48, 49. Brunetti objects to the referral, stating that the FBI improperly cited the referral as a basis for withholding. Pl. Opp. at 3–4. However, the FBI merely referred the documents to the Criminal Division for review by the Criminal Division. The referral was not a basis for withholding, but was merely a procedure for having the records processed by the component of the Department of Justice in the best position to determine whether the record is exempt from disclosure. See 28 C.F.R. § 16.42 (2003). The Criminal Division withheld two documents pursuant to exemptions 5 U.S.C. § 552(b)(5) ("exemption (b)(5)"), 5 U.S.C. § 552(b)(6) ("exemption (b)(6)"), and 5 U.S.C. § 552(b)(7)(C) ("exemption (b)(7)(C)"); one document was partially redacted pursuant to (b)(7)(C), and one docu-

ment was released in its entirety. Beck Decl. ¶¶ 8–10.

### A. Exemption (b)(5)

Exemption (b)(5) provides that "inter-agency or intra-agency memorandums or letters which would not be available by law to a party ... in litigation with the agency" are exempted from disclosure under FOIA. 5 U.S.C. § 552(b)(5). This exemption has been construed to apply to documents that would be subject to the attorney-client and work product privileges in the context of civil discovery. *N.L.R.B. v. Sears, Roebuck & Co.,* 421 U.S. 132, 149, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *Tax Analysts v. I.R.S.,* 294 F.3d 71, 76 (D.C.Cir.2002). The attorney work-product privilege protects the mental processes of the attorney. *United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). The document must have been created in anticipation of litigation and may include various documents, including interviews, statements, memoranda, correspondence, or briefs. *Hickman v. Taylor,* 329 U.S. 495, 509–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947). This exemption also covers documents that would fall within the " 'deliberative process privilege,' " which protects from disclosure those documents " 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.' " *Nat'l Ass'n of Home Builders v. Norton,* 309 F.3d 26, 39 (D.C.Cir.2002) (quoting *Petroleum Information Corp. v. U.S. Department of the Interior,* 976 F.2d 1429, 1433 (D.C.Cir. 1992)). Information is exempt only if it is both "predecisional" and "deliberative." *Id.* Documents are "predecisional" if they are prepared to assist the agency decision-maker in arriving at a decision, rather

---

**9.** Unlike exemption (b)(7)(C), exemption (b)(7)(F) does not require a balancing of interests, but rather focuses on the potential harm to the third party.

than to support a decision already made. *Id.* Documents are "deliberative" if they reflect the "give-and-take of the consultative process." *Id.* This exemption ensures that those in advisory roles are able to express their opinions freely to agency decision-makers without fear that public disclosure would "inhibit frank discussion of policy matters and likely impair the quality of decisions." *Bureau of Nat'l Affairs, Inc. v. U.S. Department of Justice,* 742 F.2d 1484, 1497 (D.C.Cir.1984).

The FBI has invoked exemption (b)(5) to withhold two items. The first document is an "undated, draft letter from George Proctor, Director of DOJ's Office of International Affairs, to the Central Authority of Italy requesting that Italian authorities interview an individual in conjunction with a criminal prosecution." Beck Decl. ¶ 15. The second document is an undated draft of the same letter translated into Italian. *Id.* The FBI argues that these letter clearly qualify as attorney work product because "[t]hey were prepared by DOJ attorneys, reflect those attorney's thoughts, impressions, and understanding of factors to be considered in making a Request for Assistance to a foreign government, as well as specific facts relied upon by those attorneys." *Id.* In addition, the letters were created in anticipation of the litigation, i.e. the RICO prosecution. *Id.* The FBI also argues that the letters are properly withheld under the deliberative process privilege because the letters are drafts reflecting the Criminal Division's proposed strategy for obtaining assistance from the Italian Authority. The Court agrees that these documents qualify under both privileges, and therefore exemption (b)(5) was properly relied

upon to withhold these documents in their entirety.[10]

### B. Exemption (b)(7)(C)

 The Criminal Division invoked exemption (b)(7)(C) to as a basis for redacting "names of law enforcement personnel and names of third parties identified in connection with the investigation, or specific information that might reasonably be expected to assist in identifying these third parties" from two additional documents. Beck Decl. ¶ 19. One of the documents is a letter from Frances Townsend, Director, Office of International Affairs, to the Central Authority of Italy requesting records pertaining to a third party in connection with Brunetti's prosecution. Beck Decl. ¶ 19, Ex. 6. The other document was a cover letter from Kevin Smith to Michael DeFeo, transmitting the official Request for Assistance, and its Italian translation. *Id.* ¶ 20, Ex. 6. Both letters were final versions and were released to Brunetti subject to the redactions in question. *Id.* ¶¶ 19, 20.

Under the exemption, the agency must balance the privacy interest of the individual in question and the public interest in having the information released. As discussed above in relation to the FBI Special Agents and others, the release of this personal information might lead to embarrassment or public notoriety. At the same time, release of the information does not appear to serve a legitimate public interest that would necessitate disclosure. However, disclosure of information to another party does not diminish the privacy interests of the individuals involved here. *See e.g. Weisberg v. Department of Justice,* 745 F.2d 1476, 1491 (D.C.Cir.1984). Further,

---

**10.** The Criminal Division relied on exemptions (b)(6) and (b)(7)(C) as a secondary reasons for withholding the two letters. Specifically, the FBI invokes this exemption to protect the names of law enforcement personnel and third parties identified in the letters. Beck. Decl. ¶ 18. Because the documents were properly withheld in their entirety pursuant to exemption (b)(5), the Court finds that it is unnecessary to determine whether the use of exemption (b)(6) was proper under these circumstances.

 

there is no evidence that the Italian Authority did not treat the letters as confidential or that there is any other reason to believe the disclosure would change the analysis in this case. Thus, the application of exemption (b)(7)(C) to the letters is proper.

### V. Segregability

This Court has a duty to consider the segregability of the withheld information *sua sponte.* *Trans–Pacific Policing Agreement v. United States Customs Service,* 177 F.3d 1022, 1028 (D.C.Cir.1999). Specifically, FOIA mandates "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). "The focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Cent., Inc. v. United States Department of the Air Force,* 566 F.2d 242, 260 (D.C.Cir. 1977). "[N]on-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Id.* To establish that all reasonably segregable information has been released, the agency must provide a detailed justification for the withholdings. *Id.* at 261. The agency need not describe the information with such specificity that the information is effectively disclosed, however, the agency must show with "reasonable specificity" why the document cannot be further segregated. *Armstrong v. Executive Office of the President,* 97 F.3d 575, 578–79 (D.C.Cir.1996).

In this case, the FBI and the Criminal Division provided coded *Vaughn* indices identifying each subcategory of information identified under each exemption. In the case of individual redactions, the code for the subcategory was marked next to the redaction so as to identifying the nature of the withheld information (e.g. names of Special Agents, source symbol numbers). In instances where an entire document was withheld, the FBI explained with reasonable detail that the nature of the interviewee narrative or the Special Agent's investigative notes were such that it would reveal the identity of the interviewee. Even in those instances, the FBI withheld individual pages or groups of pages, as opposed to entire documents.[11] The Court finds that the FBI and Criminal Division provided sufficiently specific information justifying the withholdings and that Brunetti has not raised a genuine issue as to their sufficiency.

### ORDER

For the reasons set forth above, it is this 14th day of July, 2004, hereby

**ORDERED** that the defendant's Motion for Summary Judgment [# 12] is DENIED as moot;

**ORDERED** that the defendant's Motion for Summary Judgment [# 28] is **GRANTED**; and it is further

**ORDERED** that the above-captioned action shall be dismissed.

**SO ORDERED.**

---

11. To the extent that the FBI may have been able to redact those pages in an effort to release more information, the Court holds that it is unnecessary in this instance. The FBI is not required "to commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content." *Mead,* 566 F.2d at 261 n. 55. FBI's explanation of why these pages had to be withheld in their entirety is logical and is appropriately supported by multiple exemptions.